May it please the court, my name is Alan Braybender, and I represent the United States Navy, the National Marine Fisheries Service, and the other federal defendants. With me at council table today is Craig Jensen of the Department of Navy's General Counsel's Office, and I'd like to reserve five minutes for a rebuttal. This is an appeal from a preliminary injunction order that has essentially taken away the United States Pacific Fleet's ability to certify that its strike groups can detect and eliminate their biggest threat, that is, diesel-electric submarines, prior to their deployment to dangerous regions in the western Pacific and Middle East. Needless to say, this injunction is a big deal, with profound impacts on national security and the Navy's effectiveness. Today I intend to get into the Navy's environmental compliance in detail, but first I would like to explain why this injunction is so detrimental to national security. Counsel, let me ask you one question first. The injunction was stayed by a motions panel. What's the status of events at the moment? What's been happening since the stay? One exercise has been completed since the stay. One exercise is currently underway, and the next exercise will begin sometime in January, Your Honor. And when will this one be completed? I believe it will be completed in two weeks, Your Honor. And then you'll have nine more? Yes, that's correct, nine more, Your Honor. There's little doubt that the United States Navy is the most powerful Navy in the world, but it does have a weakness. It is vulnerable to attack, just like every other Navy, from modern diesel-electric submarines. This vulnerability is not a secret. It is something to which the Navy admits, and unfortunately something that other countries have also recognized. Recognizing the U.S. Navy's potential weakness, other potentially hostile countries, such as North Korea, have been pouring resources into developing, improving, and deploying modern diesel-electric submarine technology, which are designed to prevent U.S. carrier and expeditionary strike groups from entering the littoral regions, those regions close to shore, to prevent them from supporting ground forces, American and allied ground forces. Now, the Navy's best tool to detect and eliminate the diesel submarine threat is active sonar. But what concerns the Navy so much about diesel-electric submarines is that even when it is using active sonar, its most effective tool, and even when its strike groups are highly trained and certified in their ability to use active sonar in a complex integrated environment, the rate of detecting these subs is less than 100%. When you degrade the Navy's training or when you take away the Navy's training, as the district court's injunction threatens to do, the rate of detecting these subs goes down to dangerous levels. And make no mistake about it, these subs are dangerous. They carry supersonic cruise missiles capable of striking from very, very far away, and they carry highly explosive torpedoes capable of sinking ships from miles away. The enjoined exercises are the one and only chance for the U.S. strike groups, the U.S. Pacific strike groups, to practice as a team before facing this threat. Because of the dangerous nature of these subs and because of the importance of these exercises, preliminary injunctive relief is just not appropriate here. But at the very least, before a district court enjoins essential military training, it has to consider the safety of American sailors, the safety of American Marines, and the safety of the American public. I'm not clear on one thing that you said. You want to be able to detect the diesel subs, and can that only be done by our submarines or can it be done by surface vessels? It can be done by both surface vessels and submarines, but it's usually done as a team, both surface vessels, submarines, and helicopters deploying sonar buoys. It is an effort of the entire strike group. Counsel, have you in your papers done an adequate explanation as to why the mitigating things that you are not going to do really inhibit your activity? Well, first of all, Your Honor, the mitigation measures are not relevant unless – well, the mitigation measures are not relevant because this is not a mitigated FONSI. Well, your answer may be then that no, you haven't tried to explain? Well, the Navy did try to explain in the EA, and for purposes of an EA that which require concise and brief explanations, the Navy's explanation is adequate. Well, there was absolutely no analysis in the EA. At first, these mitigation measures had been promised, and all of a sudden the Navy wasn't going to do them, and that could well have something to do with the issuance of a preliminary injunction, whether or not there are additional mitigating measures to be taken by the Navy. But in the EA, and maybe I missed this, but you simply said you decided not to do it, and no explanation why. No, the Navy did consider additional mitigation measures, mitigation alternatives in its EA, and it went through a number of different mitigation alternatives, and it provided explanations in the EA why those mitigation measures were not reasonable or ineffective. But the Navy, I think you're asking, or you said that the Navy had dropped mitigation measures. The Navy dropped only one mitigation measure, and that's the powering down during surface ducting and at night in low visibility conditions. Now, the Navy does explain why it dropped that measure. It needs to practice. Could you repeat it for me, the reason why? It needs to practice at night, and it needs to practice in low visibility conditions. That is when it can expect to face these diesel-electric submarine threats. The Navy also did, the Navy also, well, the premise behind that mitigation measure is that the Navy is not going to be able to monitor its safety zone at night and in low visibility conditions. But the Navy explained that with the use of night vision goggles, it can see at night, it can monitor the safety zone, and during low visibility conditions, with the use of low visibility techniques, it can adequately monitor the safety zone using other sensors like infrared or thermal imaging. So this mitigation measure was really not, provided no value to marine mammals and significantly impacted the Navy's training. That is why it is no longer part of the mitigation measures. What about the safety zone? You've decreased the safety zone. No. The Navy is employing the same 1,000-yard safety zone that it had in the first national defense exemption, Your Honor. During this period when there was a semi-settlement, you were requested to move it back considerably, and I thought you had. As a part of the settlement, right, that's correct, with the National Resources Defense Council, the Navy did increase its safety zone to 2,000 yards. Are you talking about the Pacific Rim settlement? Yes, that's right. It's part of the Rim Pack settlement. Okay. Now, in the current plan, it says it's an alternate to use the double exercise at once. Correct. Is that what you've been using? I think, no, I think they've been training one strike group at a time, Your Honor. I can look into that for you. Is the double exercise a necessary part of the plan? Well, it provides the flexibility that is necessary for purposes of the fleet response training plan. The Navy needs strike groups, a number of strike groups, to be ready to deploy to dangerous regions on a minute's notice, and providing training for two strike groups provides the flexibility that the Navy needs. Now, part of your papers say that you've been operating sonar in this area for years. What level of sonar has been used? You say that there's been no damage, so I think this is important for us to know what level of sonar you've been using. Well, the Navy has been conducting similar training exercises in the Southern California area for 40 years, and it's been using similar MFA sonar during that time. On average, it conducts seven exercises per year, which would be on par with the amount the Navy has proposed here, 14 over two years. But the level of sonar has been what you're proposing to use now? That's correct. It's the same level, Your Honor. And in that time, not a single marine mammal in that 40 years, not a single marine mammal has been observed to be harmed by Navy sonar. In fact, marine mammals are thriving in the Southern California area. Many populations of marine mammals are increasing. There is just simply no evidence that Navy sonar has been responsible for any adverse effects to marine mammals in the Southern California area. Well, your EA seems to suggest that there are going to be substantial damages. No, Your Honor. The EA predicts only minor and temporary. It said 170,000. That's correct. I mean, 170,000 is a big number, but you have to look behind the number to see what the Navy means. 170,000 minor and temporary effects. As minor as causing an animal who has heard noise to move away from the source of the noise,  And when you look at that 170,000 number, 99, 98% of those effects are to dolphins. And as the Navy explains in the EA, dolphins travel in large pods, and therefore they're easily visible to Navy lookouts, and the Navy can steer away from the dolphins. So that number is not only minor and temporary. But they also reflect effects that will not occur. Now, you also in the EA talk about the damage to the particular type of, is it, of whales, the beak whales or whatever you call them, that they would be substantially damaged. And now you try to explain that away, and it doesn't quite, your explanation doesn't quite make sense. Well, no, Your Honor, the Navy predicted no injuries to beak whales. The Navy's EA is pretty clear. I'll read you the explanation in the EA. On page excerpts of record 243, the Navy says, No Baird's whales would be exposed to impulsive noise or pressures from underwater detonations that would cause TTS, meaning temporary threshold shift in auditory function, or physical injury. And if you look for every single beaked whale species on excerpts of record page 246, and on excerpts of record page 257, you'll see that the Navy says the same thing about each and every beaked whale species. So the Navy predicted no injuries to beaked whales. And the district court's fact-finding there was fairly... What's this language about the 466 instance of harassment of beaked whales as level A harassment? Your Honor, the Navy, in its tables at page 253, does list beaked whales in the level A category, but then you have to look, they have two stars next to it. So you go down to the bottom of the page where the two stars, and it says that all level B exposures for beaked whales are counted as level A. Therefore, the total 233, over annually, level A exposures includes beaked whales, sub-TTS, and TTS exposures. The Navy is saying that all beaked whale exposures will be level B, non-injurious temporary exposures. The Navy classified them as level A to highlight them so it can take a closer look internally at the beaked whales. It took a harder look at the beaked whales because of this classification. But the Navy did not predict that these beaked whales would become injured as a result of its sonar exercises. And the district court's fact-finding there is clearly erroneous, and it is significant, because it provided the only basis for the district court to find irreparable harm, the only basis for the district court to find significant effects under NEPA, and the only basis to find effects under the CZMA. Now... Why did you have to call them level A in order to do further, closer looks? I don't understand that. I don't understand it either, Your Honor, but that's what the Navy did, and that's what the record shows the Navy did. It did not predict that these effects would be level A. It predicted that they would be level B exposures. And I see I'm approaching my rebuttal time, so unless the court has any other questions... I just want to ask one question. Your basic argument seems to me to be based upon this is necessary for national security. And yet NEPA, unlike the other environmental statutes, did not put in an exception for national security. What is your response to that? Well, the Navy is not claiming that there is a national security exception to NEPA. The Navy is complying with NEPA. But even if there was a violation of NEPA, NEPA doesn't contain a remedy. There is no mention of an injunction anywhere within NEPA. So the remedy comes from the APA. But the APA also does not mention anything about an injunction. The possibility for... Well, it does. It's always understood that if there is a potential for harm, you're supposed to do a full EIS. And I guess we've many, many times enjoined and required that an EIS be prepared. I mean, that's just kind of standard Hornbook law. Well, the possibility for injunctive relief only comes from the traditional common law principles. And under common law, you not only have to ascertain whether or not there is a violation of the statute, but you also have to assess irreparable injury and you have to assess the public interest. Well, I understand that, but you're suggesting that there's no remedy to impose an injunction. That's clearly not correct. No, I'm saying the district court, before entering an injunction, even if there is a NEPA violation, has to consider the public interest. And the public interest here does not favor enjoining essential military training activities. All right, counsel. We'll give you your full five minutes for rebuttal. Okay. Thank you. May it please the court, Richard Kendall on behalf of the plaintiffs. Counsel, I'd like to start out with a question. The Navy says that they've been carrying on similar exercises for 40 years with the same level of sonar and there's no evidence of any damage. What's your response to that? Several things, Your Honor. First, the answer given before about prior levels of sonar, I think counsel may have misspoken. There is evidence in the record about sonar use in 2003 and what the levels were. I don't think that you'll find anything in the record establishing the actual decibel levels prior to that time. But focusing on the point, Your Honor, the National Marine Fisheries Service has stated that the injuries that are forecast by the evidence in this case would rarely be documented. So the fact that the Navy has not observed this damage does not mean that it didn't occur and that is the finding of what's known as NIMPS, the Marine Fisheries Service at supplemental excerpt of Record 396-404-405. The United States Marine Mammal Commission convened 30 scientists. They cautioned that the overwhelming evidence demonstrates the potential for serious harm. The Office of Naval Research agrees, stating the evidence of sonar causation is completely convincing. That's a supplemental excerpt of Record 208 and the International Whaling Commission report is to the same effect. Measure all of this science against the NEPA standard. And the NEPA standard is the potential for future harm, not evidence of past harm. That's found in the Blue Mountains biodiversity case. Are those figures that you gave us in the record, do they relate to damage in general or damage in this particular area? They relate to damage in general, Your Honor. Is there any reason that there'd be less damage off the Southern California coast than there would be in other tests? No reason whatsoever, Your Honor, with one caveat, which is there are certain environmental conditions that enhance damage. For example, there's already been discussion of surface ducting. When surface ducting is present, that creates a greater risk. When you're near the shore, that creates a greater risk. Much of this is going to be close enough to the continental shelf to be in a particular environmental situation where sonar is particularly dangerous to marine animals because of the fact that you're near the land. This was one of the issues that resulted in precautions that we were able to negotiate through the consent injunction after the temporary restraining order was granted in RIMPAC and asked for a greater exclusion at least 12 nautical miles from land. The Navy has refused to do that here. We're very concerned that the islands and the continental shelf in combination create problems when the Navy trains in those areas. We do not, and I want to make this very clear, as we have throughout this litigation to the Navy, in fact throughout 13 years of litigation that Mr. Reynolds and I have been involved in against the Navy, time and time again we have said we do not oppose training. We do oppose careless training. We do oppose training that is conducted without effective mitigation that even the Navy has done before. We do oppose training that is done without the environmental analysis that our laws require. Do you think this would be cured by requiring the Navy to prepare an environmental impact statement? It would. First of all, merely going through that process involves the Navy in a more serious consideration and the public, which historically has meant our organizations among others, in a dialogue with the Navy. Our own experience has been that dialogue, when they realize that they need to obey the law, has produced training that has been less harmful and fully achieved their objectives. Where has that occurred? A good recent example has been off the coast of Hawaii in the RIMPAC litigation. Are those the same measures that you're seeking here? Well, we're seeking some additional measures that are particular to this location. And remember, we have the Coastal Commission here, which is considering what is required in order to fulfill the mandate of the Coastal Zone Management Plan. And so they have proposed a series of mitigation measures as well, which are focused on the particular damage to the coast. This court explained, I think quite eloquently, in California against Norton a few years ago, reviewing the extensions of oil leases off the coast of Southern California, how NEPA and the Coastal Zone Management Act were born. And they were born when the public realized in the aftermath of the Santa Barbara oil spill how important it is to make sure that federal officials, whatever agency they may be, are not careless. We've learned the lessons in the past of what happens when there's not a sufficient review. And that's the purpose of both of the statutes that bring us before you today, to make sure that there is that kind of study. It is undisputed that these ocean areas, as this court has stated in California against Norton, and as is fully evident in the record, are some of the richest areas for marine mammals anywhere in the planet. There are at least 36 species of marine mammals, including one of the world's major populations of endangered blue whales, right in the area where the Navy plans to train. Let me go back to the question I asked you initially. The Navy said it's been conducting similar operations in this area for 40 years. And as I understood your answer when I asked about the damages from that operation, you said what we look to is projected damage in the future, not past damage. That may be, but it doesn't really, it may be an irrelevant question I'm asking, but it is nevertheless a question. In these 40 years of operations, is there substantial evidence that there has been damage? Your Honor, the problem with damage to marine mammals is that you don't see them immediately come up and announce that they've been damaged. The evidence that's accumulated in the past primarily 10 years around the world associates naval sonar with damage to marine mammals, and that evidence is in the form of strandings. Strandings? A whale is beached. That's how you know that there's been damage. The problem is that we have deep diving species who are injured, who do not come up right away, but if anything, pursue avoidance behavior as long as they're able to. And the declarations that we have provided explain the various mechanisms by which these injuries can occur. Now, the injuries may be crippling injuries, and that's what you see in strandings, but they may also be the kinds of injuries that the National Marine Fishery Service has described as profound, which are behavioral injuries. If we had no whales in the SoCal area as a result of sonar, that would be a tragedy. It's also, whether you think that's a tragedy or not as an environmentalist, the law is that these level B effects are effects that have to be avoided, and that's why the Navy was concerned about them in its EA. There's no evidence in the record apparently as to what the sonar levels have been in the past 40 years until the last two or three? That's right. That's right. And nor is there evidence in the record that the sonar has been the same sonar and that it's been used in the same way and that the strike groups that assemble are using sonar not only with submarines and boats, but also sonar buoys. What the record shows is that this level of use will insonify the area for miles around, and the science, even the Navy's own science is convinced that damage results from this. The fact that the evidence has not shown up in the Navy's telling of the story, remember civilians are not out there in the middle of the ocean while this is happening, with whale carcasses that they immediately identify and say are associated with the Navy, is to my way of thinking not surprising given the science that I described to you before, the findings of our own agencies like the Marine Fishery Service that say it would rarely be documented, and also if you look at the scientific battle that is reflected in the EA, apart from the Navy's concessions which are sufficient to support this injunction, you can see that the Navy attempts to explain away even the most dramatic strandings that have occurred around the world as not their fault when they can say that the evidence is not clear. I think what we're left with is that you would expect these injuries to occur, and there are ways to avoid them, and the Navy is choosing not to avoid them. That's against the law, and it's especially against the law where they ignore the process, the EIS process that requires them to take a hard look at what they're doing, and it is especially against the law when they, even in their EA, fail to evaluate the mitigation measures to the extent that is required by the law. I'll give one example. I think one of the questions my learned friend was talking had to do with the power down requirements for surface ducting conditions. The environmental assessment does not even mention that measure for consideration. I think counsel may have misspoken. Even though the Navy has routinely employed that measure from June of 2006 to January of 2007, and a little bit of history I think is useful here. This is history that was pointed out by Judge Mylon Smith in his dissent, which is in the wake of RIMPAC we had not only our injunction, but while that case was on appeal from the temporary restraining, actually while that case was in briefing before Judge Cooper when we were seeking our temporary restraining order, the Secretary of the Navy propounded the first national defense exemption, exempting the Navy from the Marine Mammal Protection Act. We still prevailed because we still had our NEPA claims before Judge Cooper, but in doing so the Secretary of Defense announced a protocol in support of that defense exemption under the Marine Mammal Protection Act, and as Judge Smith pointed out in his dissent, they have walked away from even the mitigation that the Secretary of Defense found was appropriate. So here they come to us today and they say, we can't do these things and sailors can't be trained if we follow this mitigation, and yet their own Secretary of the Navy felt that was perfectly appropriate mitigation only a year ago. It doesn't make sense. This Court has in the record a very thorough 20-page opinion, by a federal judge who dug into, as she put it in the hearing, the bushels of documents and beacons boxes full of documents in a closely reasoned opinion. They would have to show that she abused her discretion and that the factual findings that she made were clearly erroneous. There's really been no showing of that, and let's remember where we are in this litigation. This is a preliminary injunction hearing where the district judge has analyzed these issues very thoroughly. What more could you want a district judge to do? Well, counsel, why wouldn't it be more reasonable, rather than entering a blanket injunction, why wouldn't it be more reasonable for the district judge to adopt mitigating conditions and then permit the exercise? Well, that's a very good question, and of course, if the district judge had done that, the Navy would be here saying she's trying to run the Navy. Yes, well, that may well be true, but that doesn't really answer the question of why wouldn't a district judge or why shouldn't a district judge adopt those mitigating circumstances which you believe would allow the Navy to conduct the exercises and protect your interests. Well, when I was in law school, one of the members of your panel taught judicial administration, so what I know about that maybe dates back to then in my clerkship, but here's my perspective. You went to SC? I did. My son goes there now. My perspective on that is the role of the courts is to assess whether a legislative enactment is complied with by the executive branch, not to tell the executive branch how to comply. Well, that's true, except when you're issuing an injunction, not deciding the case, that's certainly a remedy that's available to a district judge, and when you're dealing with serious interests on both sides, the idea while you're preserving the issue so it can be resolved, I would think would be to do the least damage to either side, and I gather that you're satisfied that the Navy could conduct operations under certain mitigating conditions. I think the problem here is that the Navy didn't do the mitigation analysis, so in the record we have a paucity of evidence, so if I were, if the shoe's on the other foot and I were trying to decide a case like this, I would say to the Navy, you're supposed to follow the process. There's a reason why you're supposed to follow the process. That's to flesh out all of these issues, and every time we've litigated against the Navy, the same thing has happened. It started with a case before Judge Wilson in 1994 involving the Navy using explosives off the coast of Santa Barbara. The injunction has issued, we've then negotiated with the Navy, and they've managed to train just fine using mitigation measures that were approved, but I think if the court starts to impose, without a sufficient record, onto the Navy particular mitigation, you start erring towards the kinds of cases like Gilligan against Morgan and the Egan case, where the courts are beginning to intrude on the prerogatives of the executive branch. I think what the court needs to be doing is deciding whether the Navy has complied with the law. Well, it can give the Navy the option of having a complete injunction or one with mitigating conditions. It could, much like an alternative writ. That's something that could happen, and perhaps that's appropriate. Our position, of course, is that we want to enforce the process, and we want to have the benefit of these environmental statutes. I think the Navy would have to agree that we've always been flexible in our litigation positions in trying to enable them to train. That's been the history of every one of these litigations, including all of them in front of Judge Cooper. Do you think that this is a case that we should refer to mediation? First of all, we've been there in the circuit's own program. I have spent, and my colleagues even more, more afternoons opposite admirals and other uniformed personnel, as well as Navy and DOJ lawyers. You can imagine our experience is that every time push comes to shove, it's the injunction that results in the action. The shifts don't sail until we have the power of the court. Are you suggesting that it's not clear in the record exactly what mitigating actions should be taken by the Navy, and it will not be clear unless the record was more fully developed? Because they're supposed to study them. That's the whole purpose of this process. Where it all began was that the Santa Barbara oil spill was caused because of an unlined well that a federal regulator just didn't think hard enough about, and didn't impose lining the oil well on the company running that oil well. Well, here they just didn't think hard enough about the mitigation that was required and the fact that they'd previously done it. I think what they've done is basically rolled the dice, because they're trying to establish a position that they don't have to mitigate at all, and what they do in the way of mitigation is by their own good graces and nothing more. We think that's contrary to law. We think that's the job of the courts to tell them they have to prepare an EIS. If they want to try to avoid preparing EISs, which this record does not enable them to do, they need to show that there will be no significant environmental effects, and they need to show that their mitigation will avoid them. That's the lesson of all of these environmental cases. Glacier Bay, Southern California waters, the same thing. Thank you, counsel. Thank you. Counsel, Mr. Kendall says the record does not tell us over the past 40 years what the level of sonar was or whether it was sonar of the same nature. Well, Your Honor, I did not misspeak. It is in the record. It's on page 1136 of the excerpt of the record, and it says prior to the development of current sonar, the Navy's use of SoCal operating area for anti-submarine warfare training began around 1937. During World War II, Navy personnel training with sonar used those systems effectively against enemy submarines during combat. Those activities were similar in nature and intensity to those currently analyzed in the JTFX and Computex EA. Now, what's the reference? Who's saying that? That is Conrad Erkelins. He is the Navy's environmental coordinator, I believe his title is. That's a fairly general statement. Those activities were similar in nature. That doesn't tell us too much about the level of sonar. Your Honor, that is what is in the record. Now, Judge Fletcher, I did misspeak. Apparently the Navy has never used a 2,000-yard safety zone, not even as a result of the mediation or settlement with NRDC. It did use a 2,000-yard safety zone only during surface ducting conditions, not as a general matter. Now, before a district court enters an injunction, it should consider the safety of American sailors, Marines, and the American public. But the district court didn't do that. This Court has already determined that. She did the colloquy in the transcript, but I agree with you, there's nothing in the opinion itself. Not even in the colloquy of the transcript. She was talking about the harm to the Navy, not the public interest. This Court already said in its order staying the injunction pending appeal, but the district court didn't adequately consider the public interest. And because of that, we believe the injunction should be vacated. And there are other reasons to vacate the injunction as well. That was what two of the three judges said then. And I think the third judge said the opposite. Well, I think that's true, but it's the majority that has binding... Well, there's nothing binding about what the motions panel did. Yes, Your Honor, it is binding. It's law of the case. This Court said in the United States v. Hauser that the law of the case doctrine applies to motions panel's decisions. It said it does not apply as strictly, but the reason for not as strictly applying it is that motions panels do not explain their rationale in published opinions. Well, there's another reason, counsel. I've just come off of a month on motions, and we were dealing with about 300 motions and several emergency motions, and we do the best we can to backstop and handle emergencies. But just our process is such that an opinion coming out of a motions panel is our best guess at the moment. But not in this case, Your Honor. The motions panel explained its rationale in a 25-page opinion, a very thorough opinion. And it is published. It is binding precedent in this circuit. District courts will be bound by it. Court of appeals panels will be bound by it. They'll be bound by it until we issue our decision. No, it is a published decision, Your Honor. It'll still be published, but it won't be binding if we have a different view. That's not what this court's rules say. Okay. You may disagree, but if we enter a decision that's to the contrary, I can tell you that you may have a different view, but it's not going to be the motions panel decision that would be binding. It would be ours. Well, both decisions will be binding. Well, they can't if they say the opposite thing. I think you'd better stick to the merits counsel. Okay. Thank you, Your Honor. Now, there are other reasons to vacate the injunction besides the fact that the district court didn't properly consider the public interest, and that is the basis for preliminary injunctive relief has always been irreparable harm to a person. NRDC never attempted to show irreparable harm to a single person. It made no attempt to do that at all. Well, isn't the assumption that harm to the environment is harm to the public? That's kind of the basis of NEPA. No, the Supreme Court has said that a person must be injured. Well, it's the same thing, Your Honor. Only people have standing to raise irreparable harm arguments. Whales do not have standing to raise irreparable harm arguments. That's a fine argument, counsel. I don't think that's anything that we've ever subscribed to. The Supreme Court has said that only people have standing, Your Honor. Whales do not have standing. NRDC had to show that some person will suffer irreparable harm as a result of the Navy's activities. NRDC never attempted to make that showing. There are other reasons to vacate the injunction as well. That is the district court misjudged the merits. It used extra record materials. Let's stop about that extra record materials. You filed an administrative record two days after the complaint was filed? No, the Navy and the National Marine Fishery Service have never filed administrative records in this case. You never did file it, right? No. Well, can we assume that the documents cited, prepared by the Navy or cited by the biological opinion, would be within the record? Well, the EA would be within the record and the biological opinion would be in the record. That's true. But that's all we can look at? Well, yes. Until the Navy and until the National Marine Fishery Service have assembled the record, we do not know what is going to be in that record. Well, should we stay things until we know what's in the record? No, you should vacate the injunction and remand back to the district court so the district court can assess the merits based on record materials. Well, if the record hasn't been furnished, when will it be furnished? Certainly there has to be an administrative record behind the EA. Do you agree with that? There is one, yes. And where is it? It has not been assembled yet. The district court prematurely entered the injunction. They could wait until the exercises are over and then worry about an injunction, right? Well, at the time of NRDC's motion for a preliminary injunction in the district court, the next exercise was not going to occur for another month. The district court could have ordered the Navy to provide a record in a week, in two weeks, and the Navy would have done its best to provide that record. But the Navy has never been given the opportunity to provide the record, and the district court proceedings are staged, so the Navy has not been working on it. But once this case is remanded, the Navy will provide the record, and the merits should be assessed based on that record. And there's one more thing I'd like to add, Your Honor. The Navy is preparing an EIS. The Navy is preparing an EIS for the Southern California range. It does not just take into account these 14 exercises. It takes into account everything that is going on in Southern California. So an injunction in this case... When is that expected? I think a rod will be out in December 2008. A little over a year from now. That's correct. So there is no need to enjoin the Navy to obtain environmental compliance, even if the Navy had violated NEPA here. The Navy is working on an EIS, and one will be provided. Is that a concession that in fact an EIS is required? No. Okay. This EA analyzed only 14 activities. The EIS in the SoCal area, for the SoCal area that is being prepared now, analyzes everything, all activities that will happen in that area. So that EIS, I guess, can be looked at as being the superhighway, while this EA analyzed only maybe an intersection. And if the Court has any more questions, I'd be happy to entertain them. Thank you, counsel. The case just argued will be submitted. Court will stand in recess for the day. Thank you.
judges: B. Fletcher, D.W. Nelson, Reinhardt, Ccj